# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

| | |
|---|---|
| SHIRLEY WHITE, as Wrongful Death Beneficiary of KEITH PERKINS, Deceased | PLAINTIFF |
| VS. | CAUSE NO. 2:09-CV-00161-GHD-JMV |
| WEXFORD HEALTH SOURCES, INC. | DEFENDANT |

CONSOLIDATED WITH

| | |
|---|---|
| SHIRLEY WHITE, as Wrongful Death Beneficiary of KEITH PERKINS, Deceased | PLAINTIFF |
| VS. | CAUSE NO. 2:09-CV-00162-GHD-JMV |
| CHRISTOPHER EPPS, Individually and in His Official Capacity; and GLORIA M. PERRY, M.D., Individually and in Her Official Capacity | DEFENDANTS |

## FINAL EXPERT REPORT OF BERNARD A. MICHLIN, MD, FACP

Mr. Perkins was a 36-year-old African American male who had a long history of a seizure disorder for which he took the medications Keppra, 500 mg., two tablets in the morning, three tablets in the afternoon and two tablets at bedtime; Lamictal, 200 mg., one tablet twice per day; Tegretol, 200 mg., one and one-half tablets three times per day.

In April of 2008, Mr. Perkins was arrested and incarcerated in the Tunica County Jail.

On April 22, 2008, while in custody at the Tunica County Jail, he completed a Medical Screening Questionnaire where it was documented that he was carrying medications for seizures. The Questionnaire inquired if the individual had epilepsy, to which Mr. Perkins answered yes. The

00249944.WPD

**EXHIBIT "A"**

medications Keppra, Tegretol and Lamictal, and the correct dosages, were documented on the Tunica County Detention Center Medication Distribution Form, and he received his medications as documented. There were also instructions that the patient should be kept on the first floor in a bottom bunk.

His last dose of medications was administered by Tunica County Jail personnel at 8:00 a.m. on June 12, 2008, at which time he was transferred to the Mississippi Department of Corrections. The medical records from the Tunica County Sheriff's Office mentioned his seizure disorder and his medications. He was receiving his anti-seizure medications and was completely seizure free at the Tunica County Jail from April 22 through June 12, a period of 51 days.

1.

Upon his arrival at the Mississippi Department of Corrections (M.D.O.C.) on the morning of June 12, 2008, a patient data sheet was completed by Sandra Cox, an LPN employed by Wexford Health Sources, Inc. (hereinafter "Wexford"), as an intake nurse. Wexford contracted with the State of Mississippi to provide health care at the Central Mississippi Correctional Facility. On the second line of this form, next to the date of birth and under the heading of "Allergies," is written Dilantin. On the second page, there is a section indicating "Current Medications", "Last Dose", and "Complaints", where they wrote Keppra, Lamictal and Tegretol. Below that, under "Allergies", Dilantin is once again written in.

On page two under Medical History, "Seizure disorder" is circled. Under the "Medications" section, Tegretol, Keppra and Lamictal are written. Under "Allergies", Dilantin is indicated. On the Mississippi Department of Corrections Sheet Intake Mental Health Screening and Assessment form, under "Psychiatric Screening", on the right side of the page, Number 8 is "History of Cerebral

Trauma or Seizures", and "Yes" is circled. This form is dated June 12, 2008.

Following the patient's transfer to the M.D.O.C., there is no record of the patient receiving any of his prescribed anti-seizure medications.

On June 14, 2008, at 3:25 a.m. it is recorded on the Mississippi Department of Corrections Interdisciplinary Progress Note that Mr. Perkins had suffered two episodes of seizure activity and that he had not been receiving his anti-seizure medications. Physical examination revealed that he had bitten his tongue... He was complaining of a post-ictal headache. There was no active bleeding, and no urinary or fecal incontinence. The Assessment was "Alteration in Health Maintenance" and the plan was to keep the patient hydrated and follow up with physician on Monday, June 16. There is no record that the prescribed anti-seizure medications were re-started at that time.

For the remainder of the day on Saturday, June 14 and Sunday, June 15, there are no records indicating any further medical activity.

At 2:00 a.m. on June 16, 2008, it was reported that Mr. Perkins was having back-to-back seizures from 11:00 on the evening of June 15, 2008 to 2:00 in the morning June 16. The Officers were instructed to bring Mr. Perkins to the Clinic.

At 3:00 a.m. on June 16, 2008, Mr. Perkins was instructed to sleep on a mat and was left in the clinic until further notice. No seizure activity was noted on arrival. His blood pressure was 120/76, pulse was 97, respiration 18, he was afebrile, and they continued to monitor him.

At 3:30 a.m. on June 16, 2008, the nursing notes indicated no seizure activity, and again it was indicated that they would continue to monitor him.

At 4:00 the morning of June 16, 2008, the patient was noted to have a grand mal seizure lasting approximately two minutes. Pittman, the Certified Family Nurse Practitioner was called,

and they received a new order for Ativan, 1 mg. I.M. They continued to monitor the patient "until other providers were available for further evaluation." Mr. Perkins remained in the Clinic for continued monitoring after administration of the Ativan, and there was no further seizure activity noted. His $O_2$ sat was 98%.

At 5:15 in the morning he was resting well with no difficulties.

At 7:00 that morning, Mr. Perkins was found on the floor, seizing. Five minutes later at 7:05 a.m., he was noted to have diaphragmatic spasms and was becoming cyanotic. He was reported to be non-responsive verbally. They began to ventilate him with an AMBU bag. The cyanosis improved and his color improved. His $O_2$ sat after respiratory assistance was 100%.

At 8:35 a.m., he was noted to have another seizure. At 8:38 a.m. he was noted to have diaphragmatic spasms, and at 8:40, cyanosis was noted. His pulse was noted to be 162. A call was put out to Dr. Brooks to follow up on the patient's current condition. The seizure ended at 8:40 a.m., five minutes after it was first noted. At that time he had bitten his bottom lip and it was bleeding. The return call from Dr. Brooks was still pending.

At 10:00 a.m., there is a note indicating that the inmate was lying on a mattress on the floor without any complaints, and that he still had not received his medications for four days. He was assessed to have seizures, and Dilantin was ordered, 300 mg. orally each night for 210 days, but it was not administered. An appointment to the Neurology Clinic was ordered.

At 11:00 a.m., the patient's blood pressure was 129/84, pulse was 133, and $O_2$ saturation on room air was 94%.

At 2:45 in the afternoon, he was noted to have another seizure and the doctor ordered 400 mg. of Dilantin intramuscularly, which was administered. The patient was noted to be drowsy and groggy from the seizures.

At 5:30 that afternoon, the patient was noted to be unresponsive, and three seizures were noted, each lasting about two minutes.

At 8:00 in the evening, Mr. Perkins was noted to have another seizure that lasted one minute. There was cyanosis of the fingers and diaphragmatic spasm was noted. They stated that they were still waiting for the M.D. to respond. At 8:45 p.m., another seizure was noted with cyanosis and diaphragmatic spasms.

At 9:00 p.m., a call was received (notes do not indicate who placed the call) and orders were given and carried out, which included Ativan I.M., 1 mg., which was administered. At 9:10 p.m. another seizure was noted with diaphragmatic spasm and cyanosis once again. At 9:30 p.m., there was another seizure with the "same pattern" and the patient received 1 mg. of Ativan I.M. At 9:50 there was facial twisting, the patient was unresponsive, and diaphragmatic spasm and cyanosis were noted.

At 10:15 p.m. another seizure was noted with diaphragmatic spasm and cyanosis. His $O_2$ was 92% and his pulse was 167. At 10:20 the Medical Doctor was paged and at 10:30 p.m. the patient was ordered to the Emergency Room by the doctor. Another seizure was noted at 10:45 p.m.

At 11:00 p.m. the ambulance was called, they spoke to the nurse and gave report. At 11:20 p.m. the ambulance arrived, and it departed at 11:25 p.m.

After his departure from the M.D.O.C., Mr. Perkins was transferred to the University of Mississippi Medical Center. In the History and Physical Exam upon admission to that facility it was documented that Mr. Perkins had continued to seize in the ambulance en route to the hospital and received 5 mg. of Valium intravenously, that he was unresponsive upon arrival to the emergency room, had a brief seizure in the emergency room, and was given Ativan, 2 mg. and a loading dose

of Cerebyx, 1 gram intravenously. Following these activities, his physical exam revealed that he was lethargic, though responsive and following instructions. His blood work indicated a potassium of 5.3 and a creatinine of 2.3.

His assessment at the time of admission to the facility by Dr. Denzel Robinson on June 17, 2008 at 11:46 p.m. was "Seizure disorder and acute renal failure, probably secondary to rhabdomyolysis." The patient was admitted with a diagnosis of status epilepticus. A CPK was ordered, which came back at 32,000, with normal being 35-235, confirming the diagnosis of rhabdomyolysis. The patient was hydrated with fluids and his CPK began to decrease appropriately, and his renal function improved with hydration.

At 9:20 p.m. on June 19, Mr. Perkins suffered another seizure that was witnessed by the nursing staff. Following that seizure, the patient was noted to be unresponsive with shallow respirations. The emergency room physician was called, and at the time of the physician's arrival to Mr. Perkins' bedside, the patient went into full cardiopulmonary arrest. Cardiopulmonary resuscitation was initiated and the patient was intubated. Despite this effort, Mr. Perkins expired and was pronounced dead at 10:30 p.m.

An autopsy was performed by Dr. Steven H. Hayne. Dr. Hayne's assessment was that the cause of death was, "Changes consistent with seizures underlying cause of death, history of seizure," and "Manner of death consistent with natural causes."

## 2. SUMMARY

Mr. Perkins was incarcerated at the Tunica County Jail from April of 2008 until June 12, 2008, during which time he received his anti-seizure medications Keppra, Tegretol and Lamictal, and had no seizure activity.

Upon his transfer to the M.D.O.C. and to the medical care of Wexford, on June 12, 2008, his

anti-seizure medications were not resumed, and two days later he began to have significant seizure activity that resulted in multiple seizures to the point of having diaphragmatic spasm and cyanosis. The first documented seizure was at 3:25 a.m. on June 14, 2008. There is no documentation indicating whether or not Mr. Perkins had any seizure activity on June 15, 2008. On the morning of June 16, 2008 at 2:00 a.m., he once again began to have multiple seizure activity.

Initial treatment for the seizures was at 10:00 a.m. on June 16, when an order for Dilantin, 300 mg. each night at bedtime was written, but not administered. He received his first dose of 400 mg. of Dilantin intramuscularly at 2:45 in the afternoon on June 16, 2008. Following that, he continued to have multiple seizures and was subsequently transferred to the hospital where he expired secondary to complications from the status epilepticus.

Wexford failed to meet the Standard of Care in the following ways:

1. It did not administer the appropriate prescribed and effective seizure medications even though the intake form disclosed this prescribed medication.

2. It failed to recognize his allergy to the medication Dilantin, and administered Dilantin while he was in the correctional facility. It administered Ativan.

3. Once Mr. Perkins did begin to seize, Wexford again failed to institute the appropriate medications Lamictal, Keppra and Tegretol, which he had taken long-term and were proven to be effective for him.

4. When Wexford finally did decide to treat him, it was put off until bedtime that evening instead of being given immediately. Wexford waited four hours and forty-five minutes to give the medication. When Wexford did give him medication, it was Dilantin, which of course he was allergic to and which proved to be completely ineffective.

5. Wexford failed to timely treat Mr. Perkins for repeated seizure activity resulting in

diaphragmatic spasm, cyanosis, and rapid heart rate, which was a life-threatening situation, and neglected to have him seen by a licensed physician in a timely manner.

6. Wexford failed to recognize the gravity of his status epilepticus and repeated seizures, and did not transfer him to the hospital in a timely manner. By the time he was transferred to the hospital, Mr. Perkins had developed life-threatening and ultimately fatal complications from the seizures, including but not limited to rhabdomyolysis (rapid breakdown of muscle tissue).

7. Wexford failed to implement any procedures to cause a prisoner, who had been prescribed anti-seizure medication, to be continued on that medication. Failing to continue prescribed anti-seizure medication, without a medical reason for stopping this medication, is a potentially life-endangering event.

8. Wexford failed to give immediate attention to a patient who had experienced persistent seizures, with long period of unresponsiveness between, such seizures. Under such circumstances, immediate medical attention is necessary to prevent potential brain damage or death.

9. By the time the patient was admitted to the hospital he was a status epilepticus, a condition which was likely to result in death, regardless of any treatment the hospital might have given him.

### 3. CONCLUSION

Mr. Perkins was a relatively healthy African American individual with a well-controlled seizure disorder on three medications (Keppra, Lamictal and Tegretol) and a documented allergy to Dilantin.

During his incarceration at the M.D.O.C., Mr. Perkins failed to receive the appropriate anti-seizure medications. Consequently, he developed status epilepticus that resulted in complications directly leading to his demise.

This series of events was completely unnecessary and totally avoidable. Had Mr. Perkins received the appropriate seizure medications as ordered at the Tunica County Jail, he would have been seizure-free through his entire incarceration, or had only an occasional seizure of no clinical significance, and none of the above events would have occurred.

All of the seizure activity that led to the complications and ultimately his demise on June 16, 2008 would have been avoided if, at the time of his first seizure on June 14, 2008, his anti-seizure medications were administered in the proper loading doses. Early in the morning on June 16, 2008 Wexford should have immediately noted that his seizures were life-threatening, and transferred him that morning. The complications from the status epilepticus would have been prevented, and his demise avoided.

It is therefore my expert medical opinion that Mr. Perkins' death was completely avoidable and unnecessary, simply requiring the recognition of his seizure disorder, administration of his medications as previously described, and continuation of those medications. In addition, Mr. Perkins had a documented allergy to Dilantin, yet he was given this medication, which was a significant breach in the Standard of Care. This proved to be completely ineffective, and he received no other anti-seizure medications.

The patient was admitted to hospital, having been status epilepticus for four (4) days, with recurring episodes of diaphragmatic spasm, cyanosis, and hypoxemia. He was also found to be dehydrated with rhabdomyolysis. Therefore, by the time he was presented to the hospital, he had deteriorated to the point that his demise was most likely irreversible, regardless of the excellent treatment he received at the hospital.

It is clear, through a view of the record, that the cause of death was pulmonary arrest, secondary to status epilepticus. It is my further opinion that the negligence in this case was gross and extreme and may properly be characterized as representing a deliberate indifference to human life.

Respectfully submitted, this the 20 day of December, 2012.

BERNARD A. MICHLIN, M.D. FACP

BERNARD A. MICHLIN, M.D. FACP
6367 Alvarado Ct., Suite 200
San Diego, CA 92120 (619) 583-1954

EXPERIENCE

> WETLIN RESEARCH ASSOCIATES, INC.
> 6367 Alvarado Ct., Suite 200
> San Diego, CA 92120 (619) 583-1954
> Medical Director and Principal Investigator, August 1998 to present
> Responsible for medical oversight, serve as Principal Investigator and Sub-Investigator in clinical trials.
>
> MICHLIN INTERNAL MEDICINE GROUP
> Sole proprietor, 1982 to Present
> Practice general Internal Medicine, serve as a Clinical Preceptor for Stanford University School of Medicine.

EDUCATION

> COLLEGE OF MEDICINE AND DENTISTRY OF NEW JERSEY
> Doctor of Medicine, 1979
> Resident in Internal Medicine, 1979 to 1982
>
> UNIVERSITY OF SOUTHERN CALIFORNIA
> Bachelor of Science, 1974

CERTIFICATES AND LICENSES

> Fellow of American College of Physicians, 1/2006
> American Board of Internal Medicine, 1982
> State of California Physician and Surgeon license #G43755, 1982 to present

PROFESSIONAL ACTIVITIES

| | |
|---|---|
| ~~DRG DIRECTOR at AMI Valley Hospital, El Cajon, CA~~ | ~~1983-1989~~ |
| DIRECTOR of AMI Valley Hospital Medi-Van | 1983-1989 |
| DIRECTOR of Mission Bay Valley Home Health | 1992-1993 |
| PRESIDENT of San Diego Quality Care Medical Group, IPA | 1986-1990 |
| CLINICAL INSTRUCTOR in the Department of Community and Family Medicine at UCSD School of Medicine | 1986-1990 |
| CO-DRG DIRECTOR at Alvarado Hospital, San Diego | 1987-1995 |
| CHIEF OF MEDICINE AND DIRECTOR of Medical Education, | |

**EXHBIT "B"**