# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF MISSISSIPPI

DELTA DIVISION

```
————————————————————————  *
                            *
SHIRLEY WHITE, As Wrongful Death*
Beneficiary or KEITH PERKINS,  *
DECEASED,                      *
                               *
             Plaintiff,        *
                               *
    vs.                        *  Cause No. 2:09CV161-D-V
                               *  Consolidated
WEXFORD HEALTH SOURCES, INC.,  *
                               *
          Defendants.          *
                               *
————————————————————————
              CONSOLIDATED WITH
                               *
SHIRLEY WHITE, As Wrongful Death*
Beneficiary or KEITH PERKINS,  *
DECEASED,                      *
                               *
             Plaintiff,        *
                               *
    vs.                        *  Cause No. 2:09CV161-D-V
                               *
CHRISTOPHER EPPS, Individually *
and in his Official Capacity,  *
et al.,                        *
                               *
          Defendants.          *
                               *
————————————————————————
```

<u>VIDEOTAPED VIDEO CONFERENCE DEPOSITION OF</u>
<u>BERNARD MICHLIN, M.D.</u>

Taken at San Diego, California
March 7, 2013

T. A. Martin, CSR
Certificate No. 3613

```
 1                        I-N-D-E-X

 2  DEPOSITION OF BERNARD MICHLIN, M.D.              PAGE
         March 7, 2013
 3
            Examination by Mr. Waide
 4
            Examination by O'Connell
 5

 6  EXHIBITS:                                        PAGE

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SAN DIEGO COURT REPORTING SERVICE

1    <u>DEPOSITION OF BERNARD MICHLIN, M.D.</u>

2    Pursuant to Notice to Take Deposition, and on

3 the 7th day of March, 2013, commencing at the hour of

4 9:15 o'clock p.m., at 401 West A Street, Suite 135, in

5 the City and County of San Diego, State of California,

6 before me, T. A. Martin, Certified Shorthand Reporter in

7 and for the State of California, personally appeared:

8    BERNARD MICHLIN, M.D.,

9 who, called as a witness, and being by me first duly

10 sworn, was thereupon examined as a witness in said cause.

11    <u>APPEARANCES</u>

12 For the Plaintiff:

13    WAIDE & ASSOCIATES, PA
     By:  JIM WAIDE, ESQ.
14    Post Office Box 1357
     Tupelo, Mississippi  38802
15    662-842-7324

16

For Defendant Wexford Health Sources, Inc.:
17
    JOSEPH A. O'CONNELL, ESQ.
18    Post Office Box 18109
     Hattiesburg, Mississippi 39404
19

20 For Defendants MDOC, Christopher Epps and Gloria Perry:

21    SPECIAL ASSISTANT ATTORNEY GENERAL
     TOMMY GOODWIN, ESQ.
22    Post Office Box 220
     Jackson, Mississippi  39205
23

24 VIDEOGRAPHER:  Shayne Davidson, VideoTrack

25

3

```
 1                    EXAMINATION

 2 BY MR. O'CONNELL:

 3    Q.  At this time, Dr. Michlin -- I'm Joe O'Connell,

 4 and I'd like to ask a few questions.

 5         First, what have you read and reviewed in

 6 connection with evaluating this case and preparing for

 7 your testimony today?

 8         MR. WAIDE:  Excuse me for interrupting, Joe.

 9 That is not an appropriate question.  The question is his

10 qualifications.  You can cross-examine --

11         MR. O'CONNELL:  Well, the extent to which he's

12 familiar with this stuff goes to what he knows and that

13 goes to his qualifications.

14         MR. WAIDE:  Doctor, I can't -- I mean I meant to

15 just -- the objection should be as to whether he's not

16 qualified to be an expert in internal medicine.  The rest

17 of this you can do on cross-examination and ask him all

18 day.

19 BY MR. O'CONNELL:

20    Q.  Well, you know, let me ask you, if you would,

21 Dr. Michlin, to answer that question.

22         MR. WAIDE:  You'll have to answer, Doctor.  I'm

23 sorry to interrupt your deposition, but we have to tender

24 you as an expert and I can't control what he asks, so

25 you're going to have to tell him what you reviewed.
```

                                                        13

1        THE WITNESS:  That's all right.

2        Joe, can you move over a little bit closer --

3  there we go.  Thank you.

4        MR. O'CONNELL:  Can you see me now?

5        THE WITNESS:  Yes, thank you.  Could you please

6  repeat the question.  I forget what it was.

7  BY MR. O'CONNELL:

8     Q.   Okay.  What have you read and reviewed in

9  connection with evaluating this case and preparing for

10  your testimony today?

11     A.   I have read all of the documents that have been

12  forwarded to me from Mr. Waide's law firm, including --

13     Q.   What does that include?

14     A.   Including the -- Mr. Perkins' previous medical

15  history and records, some of the records from the jail,

16  the records from the prison system, the records from the

17  acute hospitalization in Mississippi, the coroner's

18  report and death certificate, and then a number of

19  depositions, as well as a summary of depositions and

20  the -- the report from Dr. Lundquist and Dr. Hartwig, I

21  think his name is.

22     Q.   Okay.  And when did you -- go ahead.

23     A.   And I always -- in order to back up my opinions,

24  I always refer to the two Bibles of medicine that I

25  consider, which is Harrison's textbook of internal

14

1 medicine and Cecil's textbook of medicine. I referred to

2 the seizure section in both textbooks. I will stand by

3 or agree with everything said in those two textbooks. I

4 consider them to be the Bible of medicine.

5    Q.  Okay. Let me ask you this: At the time you

6 prepared your expert report in this case, Dr. Michlin,

7 had you read any of the depositions or either Dr.

8 Lundquist's report or Dr. Hartwig's report?

9        MR. WAIDE:  Excuse me, Doctor. Let me stop and

10 interrupt. Object to the form of the question.

11        Doctor, there are two expert reports. He did a

12 preliminary report early on and then he did a later

13 report. I assume you mean the final --

14        MR. O'CONNELL:  Yes, the final expert report.

15    Q.  At the time you prepared your final expert

16 report which was submitted to us I believe on January 15,

17 2013, had you, you know, read any depositions or either

18 Dr. Lundquist's report or Dr. Harwig's report?

19    A.  I usually read all of the information within two

20 or three days of receiving it. I can tell you that the

21 deposition summaries I received after writing my report.

22 I have two depositions, one from Dr. Walker, and one from

23 Dr. Brooks which I had read I believe prior to reading

24 this. I don't remember when I received Dr. Lundquist's

25 and Dr. Hartwig's reports. So I truly -- I'm sorry. I

15

1 don't remember what I knew when I wrote the report and

2 what I didn't.  I don't believe -- I can't swear by it,

3 but I don't believe I had read their expert reports prior

4 to writing my report.

5      Q.  And you are not sure, as I understand your

6 testimony, whether you had read the depositions of Dr.

7 Thornton-Walker and Dr. Brooks prior to submitting your

8 report?

9      A.  I believe I have, but I can't be 100 period of

10 time certain.  I believe I received those -- give me a

11 moment, Counselor.  I believe I read those two

12 depositions, yes.  I can't be absolutely certain, but I

13 believe I did.

14      Q.  Let me ask you this, Dr. Michlin.  Since

15 preparing your final expert report, have you ever amended

16 it or made any additions to it to further clarify or

17 elaborate on your testimony?

18           MR. WAIDE:  Excuse me.  Just for the record, we

19 are talking about two different reports.  There was an

20 early on -- and I don't have the date, Doctor, and I --

21           MR. O'CONNELL:  I did say final report.

22           MR. WAIDE:  He's referring to your final report,

23 Doctor.

24           THE WITNESS:  Yes.  I'm sorry.  Counselor, ask

25 me question again, please.

                                                        16

1  BY MR. O'CONNELL:

2      Q.   Sure.  Since you prepared your final report

3  which was submitted to us with the designation of

4  experts, dated December 31, 2012, have you ever made any

5  additions or amendments to that report to further clarify

6  or elaborate on your opinions or the bases for your

7  opinions?

8      A.   Not in writing.  I was under the impression that

9  this deposition today would give me an opportunity to do

10 that, Counselor.

11     Q.   Okay.  But you have not done so in writing; is

12 that correct?

13     A.   No.  I hadn't been requested, so I don't think

14 do anything unless I'm requested to.

15     Q.   Okay.  Now, you also acknowledge, as you did a

16 moment ago, that you have not -- you had not read either

17 Dr. Lundquist's report or Dr. Hartwig's reports prior to

18 the preparation of your final report; that's correct, is

19 it not?

20     A.   That is correct.  I believe mine preceded

21 theirs.

22     Q.   Okay.  And your final report, which has never

23 been amended, does not include any reference to opinions

24 relating to what either Dr. Lundquist or Dr. Hartwig had

25 expressed in their reports, does it?

17

1    A.  Correct, because it wasn't available to me to
2 refer to.

3    Q.  Okay.

4    A.  Somebody has to go first, Counselor.

5    Q.  I understand.

6        And you also, in your final report, do not make
7 any reference to either the deposition of Dr.
8 Thornton-Walker or the deposition of Dr. Brooks, do you?

9    A.  I believe that is correct.

10       MR. O'CONNELL:  Okay.  You know, at this point,
11 you know, again we would renew our objection to the
12 Court -- and this is for the Court, Doctor -- to exclude
13 and disallow any testimony by Dr. Michlin, you know,
14 relating to subjects not included in his final expert
15 report, because, you know, there has been no provision of
16 any related information to me about that which would
17 permit us to prepare to cross-examine him on those
18 subjects.

19       So with that, renewing that motion, let me
20 continue.

21   Q.  You know, when you were questioned by Mr. Waide,
22 you know, about your practice as an internal medicine
23 specialist, you reviewed, you know, the different types
24 of patients and medical issues and problems that you
25 address in internal medicine, and you said them so

18

SAN DIEGO COURT REPORTING SERVICE

1 quickly that I didn't get them all.

2          Would you mind repeating those slowly?

3     A.   Yes.   The practice of internal medicine includes

4 13 subchapters.   Those subchapters, not totally

5 inclusive, are heart, cardiology, lungs, pulmonology,

6 glandular, endocrinology, stomach and guts,

7 gastroenterology, urinary, which would be urology which

8 is really a surgical subspecialty, nervous system, which

9 would be neurology.   I'm not keeping count, so I don't

10 know if I'm going to hit them all.

11          Those are the big -- kidneys, which would be

12 nephrology.

13     Q.   And liver?

14     A.   Well, liver is actually hepatology, but that is

15 a sub-subspecialty of gastroenterology, so that would

16 still be part of the GI system.   I guess those are the

17 biggies, Counselor so.

18     Q.   Okay.   Thank you.

19          If you will, you know, what percentage of your

20 time do you spend in a typical six-month period as an

21 investigator and supervisor in, you know, medical

22 clinical trials for various medications?

23     A.   What percentage of my time?

24     Q.   Yes.

25     A.   I spend about 15 minutes -- about 15 minutes a

19

1 day on the average.

2     Q.  Okay.  And your C.V. lists, does it not, the

3 various clinical trials that you have supervised or

4 participated in as an investigator, correct?

5     A.  Yes.

6     Q.  And, you know, as the C.V. shows, you have

7 participated in clinical trials that relate to drugs that

8 treat anemia, diabetes --

9     A.  I'm sorry.  One of the subspecialties I left out

10 would be oncology cancer and leukemias as well as

11 arthritis, rheumatoid arthritis and other arthritis,

12 rheumatology and -- I didn't mean to interrupt.  I'm

13 sorry, Counselor.  You just reminded me.

14     Q.  Okay.  Well, I don't want to interrupt you.  You

15 think you have competed the additions you wanted to make?

16     A.  Yeah.  There is a couple more, but they are not

17 germane at this second.

18     Q.  All right.  Going back to the list of the types

19 of drugs in which you have participated as a supervisor

20 and investigator in clinical trials, we have got drugs

21 for anemia, correct?

22     A.  Correct.

23     Q.  Diabetes, correct?

24     A.  Correct.

25     Q.  COPD which is what?

20

1     A.   Pulmonary emphysema, so that is under the lungs

2 or pulmonary that we talked about.   Pulmonology.

3     Q.   Okay.   Atrial fibrillation, which is what?

4     A.   Cardiology or the heart.

5     Q.   Okay.   Chronic renal failure?

6     A.   That would be the kidneys or nephrology.

7     Q.   Okay.   Acute sinusitis?

8     A.   Yes.   That would be infections, so I didn't

9 mention infectious diseases as another subspecialty.

10     Q.   Okay.   Blood pressure?

11     A.   That would be hypertension.

12     Q.   And part of the cardiology subspecialty of

13 internal medicine?

14     A.   I guess, yes.

15     Q.   Okay.   Rheumatoid arthritis?

16     A.   Rheumatology or arthritis, yes.

17     Q.   Okay.   Osteoarthritis?

18     A.   Again, rheumatology or arthritis.

19     Q.   Okay.   Now, you know, as I review, you know, the

20 list of medications and clinical trials that you have

21 participated in, I did not see any medications that

22 related to the treatment of seizure disorders.   Is that

23 accurate and correct?

24     A.   That is correct, Counselor.

25     Q.   Okay.   Now --

21

1    A.   Would you like to know why or -- there is no
2 question pending.
3         MR. WAIDE:   You can explain your answer, Doctor.
4 If you can explain it, explain your answer.   Go ahead,
5 Doctor.
6 BY MR. O'CONNELL:
7    Q.   Well, if you want to explain it, you can?
8    A.   Well, I just don't want to give the jury or you
9 the wrong impression.
10         In order to do an investigative -- investigation
11 of any kind, you have to either have patients that are
12 uncontrolled or willing to become uncontrolled.   So if
13 you have people -- so you're always tampering with their
14 treatment protocol.   So in the case of arthritis,
15 patients always want to be better, so they don't mind
16 your tampering.   In the case of COPD, they don't mind you
17 tampering.   But in the case of seizures, when I'm offered
18 to do a seizure medication, that means taking my patients
19 which are controlled, taking them off their medications,
20 giving them a drug holiday, starting them on medications
21 that may or not be placebos.   So I don't feel comfortable
22 with that.   So the only drugs that I feel comfortable
23 testing are those in which I am comfortable that my
24 patients will not have any additional medical issues.
25 I'm not saying that seizure studies cause additional

22

1 medical issues, but in order for me to sign off on a

2 study I have to be personally -- as the primary

3 investigator, I have to be comfortable with the study.

4 So I pick and choose those studies which I want.  And of

5 the 20 or 30 studies you see listed, I have turned down

6 hundreds of studies.

7 　　　　Q.　Let me ask you this:  In your practice as an

8 internal medicine specialist, do you treat patients who

9 have pulmonary problems?

10 　　　　A.　Yes.

11 　　　　Q.　But no seizures?

12 　　　　A.　Pardon?

13 　　　　Q.　No seizures -- do you treat patients who have

14 pulmonary but no seizure disorders?

15 　　　　A.　Yes.  You are talking about the same patient,

16 correct?

17 　　　　Q.　Yes.

18 　　　　A.　Yes.  Whether or not they have a seizure

19 disorder has nothing to do with any of their other

20 disorders.  So any of my patients with seizures could

21 have any other medical issue.  In other words, having a

22 seizure doesn't preclude them from having hypertension,

23 diabetes, thyroid disease, lung disease.  The two are

24 mutually exclusive.

25 　　　　Q.　I understand that, and thank you for the

23

1  explanation.  But, you know, you also in the course of

2  your practice treat patients who simply have a lung

3  disorder perhaps and no other medical issues?

4      A.  Yes.  Usually most of my patients are fairly

5  complex.  So my -- most of my patients have at least two

6  or three different system problems.  So it could be

7  pulmonary and cardiac, or cardiac and endocrine with

8  diabetes.  I tend to have a more complicated practice

9  than other physicians.

10     Q.  Okay.  And do you also treat patients who have

11 kidney disorders?

12     A.  Yes.

13     Q.  Do you treat patients who have liver disorders?

14     A.  Yes.  That falls understand the

15 gastroenterology.

16     Q.  Okay.  At this time about how many active

17 patients do you have with heart disorders, cardiology

18 problems or hypertension?

19     A.  1000, 1500.

20     Q.  Okay.  How many patients do you see actively at

21 this time who have pulmonary problems of one type or

22 another, whether COPD or something else?

23     A.  It's interesting you should ask that question,

24 because that number is dropping since in California

25 people have stopped smoking over the last 20 years.  So

24

1 it has gone from probably 30 or 40 percent of my practice

2 in the eighties down to maybe 10 or 15 percent of my

3 practice now.  So let's say a few hundred.

4      Q.  Okay.  And how many active patients do you have

5 with diabetes or other endocrine disorders.

6      A.  That is quite high again because, as you know,

7 over the last 30 years the instances of diabetes has been

8 escalating throughout the world.  So I would say five or

9 600, keeping in mind that these can be the same patients

10 that also have heart disease or cardiovascular problems.

11          You're not asking for -- so when you add this up

12 it's going to come to more than 100 percent.

13      Q.  I understand.

14      A.  Okay.

15      Q.  How many active patients do you see at this time

16 who have, you know, kidney disorders of one type or

17 another?

18      A.  A couple hundred.

19      Q.  All right.  And how many active patients do you

20 see at this time who have liver disorders?

21      A.  Liver disorders?

22      Q.  Liver disorders or --

23      A.  Maybe 100.  I'm thinking of the hepatitis B and

24 C or the fatty livers with steatorrhea.  So a couple

25 hundred.

25

1     Q.   Okay.   How many patients do you see who have

2 other GI problems besides liver disorders?

3     A.   Oh, with your inflammatory bowel disease, reflux

4 or GERD or heartburn, as you might call it, it could be

5 three or 400.

6     Q.   How many active patients at this time do you

7 have that have rheumatology disorders?

8     A.   If you count osteoarthritis, a few hundred.   If

9 you count the more complicated ones, maybe -- maybe 20 or

10 30.

11     Q.   Now, if we could, Dr. Michlin, let's return to

12 Exhibit 6, which is your expert list of cases, is it not?

13     A.   Yes.   I -- it's not all inclusive; it's not

14 complete.   I keep it as complete as possible, but

15 sometimes things slip through the cracks, so I apologize

16 for that.

17     Q.   Okay.   Let me ask this, Dr. Michlin.   To the

18 extent it's incomplete, does it relate to cases in 2012

19 and 2013?

20     A.   Yes, because I did testify in 2012 I think

21 twice.   I don't remember the names of the cases.   One

22 took place in Riverside, California, and one was in

23 Orange County, California, I believe.   And I do

24 apologize.   I do know I testified I believe twice in

25 2012.   I'm sorry that's here.

26

1    Counselor, I think that's because I sent you the

2 C.V. when we first had initial contact.  I can try when

3 we have a break or if we have a break to give you an

4 updated list.  I believe this list -- it says updated

5 November 2011.  I do have one that's been updated since

6 the end of 2012, so it will include the 2012.

7    Q.  Okay.  Let's go back to 2006, if we may.  There

8 is one case listed there, is there not?

9    A.  Yes.

10    Q.  Okay.  That is McEuen v. W. Anaheim.  And which

11 party did you represent in that case?

12    A.  Cornelius Bahan is a plaintiff attorney, so I

13 must have been on the plaintiff's side.

14    Q.  Okay.  Do you remember what the issues were in

15 that case Dr. Michlin?

16    A.  No, I don't.

17    Q.  Okay.  If we go next to 2007, there is one case

18 listed, and it is Aurora and Melvin Lamb vs. Pacific

19 Monarch Resorts, Inc.  Which party did you represent in

20 that case?

21    A.  The defense.

22    Q.  Okay.  And what was -- was Pacific Monarch

23 Resorts your client?

24    A.  No.  I don't know who my client was.  I

25 represented Walsh & Furcolo which is a defense firm.  It

27

1 had to do -- yes, I guess they were. It had to do with

2 burns that were sustained in a fire. I don't remember

3 the circumstances of the fire which is why I don't know

4 who I represented. It had to do with the -- it had to do

5 with the injuries that the -- that the individual

6 sustained in the fire and how that pertained to medical

7 issues.

8     Q. Okay. So basically your testimony in that case

9 related to the nature and extent of the medical injuries

10 and the prognosis for this person in the future?

11     A. I don't remember exactly. I remember it was a

12 burn case, because I remember Pacific Monarch Resorts had

13 a fire and I don't remember the circumstances.

14     I -- Counselor, when I do something, a year

15 later I move on to something else.

16     Q. Okay. Let's move to 2009. And the first case

17 listed there is William Chesser V. Alea North America

18 Insurance Company.

19     A. Yes.

20     Q. Which party did you testify for in that case?

21     A. I have no specific recollection of that case or

22 any of its details.

23     Q. Okay. Let's go next if we can to the next case

24 listed for 2009, which is Gregory Slingluff V. State of

25 Hawaii. Which party did you testify for in that case?

28

SAN DIEGO COURT REPORTING SERVICE

1    A.   The plaintiff.

2    Q.   Okay.  And what were the issues in that case?

3    A.   Actually that is interesting.  Mr. Slingluff was
4 incarcerated through the system of the State of Hawaii,
5 and he suffered -- he suffered an injury while
6 incarcerated.  And it was a failure to diagnose and treat
7 and the injuries sustained from that failure.  And so in
8 a way it's similar to this case.

9    Q.   Okay.  What was the medical condition that was
10 not diagnosed?

11   A.   He had a scrotal abscess.

12   Q.   Now, just for clarification, Dr. Michlin, what
13 is the scrotum?

14   A.   The scrotum is the -- in a male, males have
15 scrotums.  It's the bag that holds the testicles in a
16 male.  So when they refer to having balls, it's -- the
17 scrotum is the bag that hold the testicles of the male or
18 the balls in the term that -- the normal term that people
19 use.

20   Q.   Okay.  All right.  Let's go if we can to the
21 next case which is Mowrey V. Harriman Jones.  Which party
22 did you testify for in that case?

23   A.   That was plaintiff as well, Counselor.

24   Q.   Okay.  And what were the issues in that case?

25   A.   That was a death related to untreated pneumonia.

                                                        29

```
 1      Q.  And was -- all right.  Let's go to 2010.  And
 2 the first case listed there we only have one name,
 3 O'Dean.  Which party did you represent in the O'Dean
 4 case?
 5      A.  I don't think O'Dean was a medical malpractice
 6 case.  I think it was a personal injury case.  Again, I
 7 don't have a specific recollection, but I remember
 8 testifying in a personal injury case with Mr. Maiorano
 9 and he's a plaintiff's attorney, but I don't remember the
10 details.
11      Q.  Okay.
12      A.  And I can't be absolutely sure that that is
13 true.
14      Q.  Was Mr. O'Dean your patient?
15      A.  No.
16      Q.  Okay.  Was the plaintiff in Aurora and Melvin
17 Lamb V. Pacific Monarch Resorts your patient?
18      A.  No.
19      Q.  All right.  The next case listed for 2010 is
20 Lefforge V. Wesley Kobayashi, DPM, et al.  For whom did
21 you testify in that case, Dr. Michlin?
22      A.  The plaintiff.
23      Q.  Okay.  And what were the issues in that case?
24      A.  That was a failure to diagnose and treat a
25 sarcoma.
```

30

 1      Q.   Okay.  And a sarcoma is what?

 2      A.   It's a very aggressive deadly tumor that -- I

 3 believe one of John F. Kennedy's children had one, the

 4 one who lost his leg in the sixties.  It tends to attack

 5 the bone, an osteosarcoma.  It attacks the bone.  And the

 6 only treatment is basically very aggressive, cutting off

 7 the leg.  And this was an individual who died because of

 8 failure to diagnose the osteosarcoma coma of the leg.

 9      Q.   I believe that was Ted Kennedy's child.

10      A.   Thank you.  Thank you.

11      Q.   Okay.  Now, let's go if we can to 2011, and the

12 case listed there is Paul Fergen.  Okay.  And did you

13 testify for Mr. Fergen in that case?

14      A.   Excuse me.  I misquote -- I misstated.  The case

15 you and I just talked about, about the osteosarcoma?

16      Q.   Yes.

17      A.   That was the case in 2011 with the Markham

18 Group.  I misstated on the Kobayashi, so we need to go

19 back to that one.

20      Q.   Okay.  So what is the Kobayashi?

21      A.   That was -- Greer & Associates was for the

22 defense, and that was for an allegation of inappropriate

23 use and dosages of opiate tell narcotics resulting in a

24 respiratory arrest and death.  I don't know that -- I

25 don't remember -- no, respiratory arrest and then

                                                         31

1 significant post-arrest neurological injury.

2    Q.  Okay.  Now, you told us a moment ago about the
3 cases from 2012.  You explained that you could not
4 remember the names, but that one was from the Riverside,
5 California area?

6    A.  Correct.

7    Q.  Do you remember now, having had a moment to
8 think, what the style or name of that case was?

9    A.  No, I don't know the name.  I don't remember the
10 name; I don't remember the attorney.  But that was
11 another urological case.  That was a gentleman who had
12 significant urological issues due to urethral strictures
13 and damage.

14    Q.  Okay.  And who was the party that you testified
15 for in that case?

16    A.  The plaintiff.

17    Q.  Okay.  Now, the other 2012 case was in Orange
18 County which is near where you live?

19    A.  Yes.

20    Q.  What -- do you recall the name of that case at
21 this time?

22    A.  The only thing I remember is being in court.  I
23 don't remember -- I'm sorry.  I don't -- I don't remember
24 anything about it.  Again, if we have a break or an
25 opportunity, I will get you an updated C.V. -- an updated

32

SAN DIEGO COURT REPORTING SERVICE

1 list, including 2012.

2      Q.   Can you remember the name of the party or --
3 whether the party whom you represented in the Orange
4 County case was a plaintiff or defendant?

5      A.   No, I don't.  I really just remember going to
6 court.  I don't have any specific recollection of the
7 case.  Doesn't tell you much about the case, does it?  Or
8 it tells you a lot about the case.  It was uninteresting.

9      Q.   Okay.  At this time let me ask you whether as a
10 physician you have ever worked, you know, day to day in a
11 correctional setting?

12      A.   No.

13      Q.   Have you ever worked in a correctional setting
14 on a temporary basis?

15      A.   No.

16           MR. O'CONNELL:  At this time, you know, we would
17 conclude our voir dire of Dr. Michlin and reserve for the
18 Court, you know, any additional motions that we have
19 regarding his qualifications and thus tender the witness
20 back to Mr. Waide.

21           MR. WAIDE:  You object -- you maintain he's not
22 a qualified expert?

23           MR. O'CONNELL:  We are going to think about that
24 in light of the information that we have received.

25           MR. WAIDE:  Counsel, do you have any questions?

                                                      33

SAN DIEGO COURT REPORTING SERVICE

1    Q.   According to your state of the medical history

2  of Mr. Perkins after he entered the Wexford facility, can

3  you tell the jury and tell us counsel -- tell us whether

4  or not in fact in Mr. Perkins' case his medications were

5  discontinued?

6    A.   Yes, his medications were discontinued when he

7  left from the jail and went to the prison system.

8    Q.   Could you tell under the -- could you tell from

9  your review of the medical records that you saw in the

10 medical records whether there was any procedure at

11 Wexford to continue a patient on his medication once he

12 was transferred from some other facility into the Wexford

13 facility.

14       MR. O'CONNELL:  Objection.  Leading?

15 BY MR. WAIDE:

16    Q.   Do you understand the question?

17    A.   Yes, I believe so, Counselor.

18         So when he entered the prison system --

19    Q.   Tell you what.  Let me ask it in a different

20 way.  I want to make sure it's not leading.

21         Can you tell us whether there was any

22 procedure -- whether or not there was any procedure that

23 Wexford had in place to keep a person who was on seizure

24 medication continuing on that medication when he got

25 transferred into Wexford?

43

1    A.   When he was transferred --

2         MR. O'CONNELL:  Same objection.

3         THE WITNESS:  Excuse me.  When he was

4    transferred into Wexford there was a notation on the

5    intake forms that he had been on these medications; that

6    he had a seizure disorder and that he was allergic to

7    dilantin.  Once that -- once that information was on the

8    intake form, that information was never continued into

9    the medical aspect of his care.  So that no one in the

10   medical areas was aware that he was on those medications.

11   It was only when he stated "I haven't gotten my

12   medications in four days; I need my medications" did the

13   issue medically ever come up that he had seizure

14   disorder.

15   BY MR. WAIDE:

16        Q.   How would you characterize -- how would you

17   characterize in this case the act of taking a patient

18   with a known history of seizures into custody by a

19   correctional facility and not taking any steps to

20   continue his medication?  How would you characterize that

21   type of --

22        A.   I would say that that would --

23        MR. O'CONNELL:  Objection.  Calls for

24   speculation, you know, not based on predicates in

25   evidence.

                                                    44

1 BY MR. WAIDE:

2    Q.  Go ahead, Doctor.  How would you describe that?

3 How would you characterize a system whereby a prisoner is

4 taken into custody by a correctional facility and his

5 antiseizure medication is arbitrarily discontinued.

6          MR. GOODWIN:  Objection for the record to the

7 record to the extent that counsel is asking for an

8 opinion with regards to the MDOC defendants or MDOC that

9 is outside the four corners of this expert witness's

10 expert report.

11          MR. O'CONNELL:  And, you know, I would just

12 renew the same objections on behalf of Wexford.  You

13 know, this is an attempt to get him to sort of address

14 and characterize matters that are likewise plainly -- in

15 additions to the reasons I stated earlier -- you know,

16 beyond the scope of his expertise.  You know, he's not

17 here as an expert on how things are done at correctional

18 institutions.

19 BY MR. WAIDE:

20    Q.  Go ahead, Doctor.  I may ask you additional

21 questions.  Go ahead and give an answer to that question.

22    A.  When somebody requires medical care and is moved

23 from one facility or one location to another, it's

24 imperative that the medical information be transferred

25 with that patient so that their medical care can be

                                                    45

1 continued. In this case we're talking about a seizure --
2 seizure medications and seizure disorder, but what if we
3 were talking about an insulin-dependent diabetic who is
4 requiring insulin and he didn't get his insulin? That
5 could be a life-threatening, life-endangering situation
6 as well. So we are not just talking one specific
7 individual, one specific disease. In general, it's
8 imperative and it's necessary and essential that
9 someone's -- important medical information be transferred
10 along with the patient so they can continue to get their
11 care. And depending on the disease in which we are
12 talking about, if that doesn't continue, then their life
13 can be in danger. HIV, for example. You have patients
14 that have HIV that must get their antiviral medications.
15 If they don't get their antiviral medications on a timely
16 and regular basis, then you're risking that disease
17 becoming uncontrolled and their death again.
18          So it's easy to just say we are talking about
19 seizures. Heart disease would be the same thing. If
20 they have congestive heart failure and they weren't
21 getting their cardiac medication, it could lead to great
22 harm or death. Diabetics not getting their diabetic
23 medication or their insulin could lead to great harm or
24 death. People with infectious diseases not getting their
25 medications could lead to great harm or death. So just

46

1 with those three examples -- and there is many more --

2 it's imperative that a medical history of a patient

3 follow the patient. I mean if we are talking about a

4 little gout and they are going to get a gout attack, that

5 may lead to a gout attack, but not death. But when you

6 are talking about serious medical issues, there has to be

7 a system in place in which to continue their medical care

8 without undo interruption.

9        Q.   In your opinion, Doctor, would you tell us

10 whether or not failing to have a system in place to keep

11 a person with a history of seizures on his medication --

12 that is, to continue his medication -- would you tell us

13 whether or not in your opinion that would represent a

14 willful indifference to human life?

15        MR. O'CONNELL:  Object to this question.  A you

16 know, this calls for a legal conclusion.  You know, it is

17 completely outside the scope of his expertise.  It

18 invades the province of the injury.

19        Also, I'd like to, you know, for the sake of

20 brevity, adopt the objections, you know, previously made

21 as to, you know, the scope of his qualifications to

22 address this.  And, you know, there is nothing in his

23 expert report or in an interrogatory answer that in any

24 way, shape, form or fashion addresses any of these issues

25 with regard to deliberate indifference.  That term never

47

1 appears anywhere the report.  And, you know, for -- all

2 the reasons I just enumerated, in addition to objecting

3 to these questions, I'd like to move to strike as

4 unresponsive and inappropriate the testimony that Dr.

5 Michlin has given to, you know, the preceding two

6 questions?

7       MR. GOODWIN:  And the MDOC defendants simply

8 renew the objection -- our last objection.

9 BY MR. WAIDE:

10     Q.  Doctor, in response to their objection that they

11 just made, would you look over to your report on Page 10,

12 the last sentence of your report.

13     A.  Yes.

14     Q.  Do you recall their objection just saying it's

15 not in your report.  Would you look on Page 10, and would

16 you read into the record the last sentence of your report

17 right above your 20 December, 2012.  Read that sentence

18 into the record.

19     A.  "It is my further opinion that the negligence in

20 this case was gross and extreme and may properly be

21 characterized as representing a deliberate indifference

22 to human life."

23       MR. O'CONNELL:  Again, I acknowledge it is in

24 his report, but this is not a proper subject for his

25 testimony.

48

1 BY MR. WAIDE:

2     Q. If you would also in response to his questions

3 that your report is inadequate or incomplete or whatever

4 objection he's making, would you look over to Page 8 of

5 your report, Paragraph 7. And would you read into the

6 record Paragraph 7 of your report.

7     A. "Wexford failed to implement any procedures to

8 cause the prisoner who had been prescribed antiseizure

9 medication to be continued on that medication. Failing

10 to continue prescribed antiseizure medications without a

11 medical reason for stopping this medication is a

12 potentially life-endangering event.

13     Q. All right. That is what you put in your report

14 at the time when you signed it on December the 20, 2012;

15 is that correct?

16     A. Correct.

17     Q. Doctor, if you would, you earlier testified that

18 both you and the defendant's expert have given a

19 history -- and it's in your report and his expert has

20 also given a history, but if you would just go through

21 and tell us in as succinct summary as you can, according

22 to the medical records, what happened to Keith Perkins

23 once he came in to the Wexford facility. Just go through

24 the history of what happened at him at that point?

25     A. He -- when was he transferred he was admitted I

49

1          Remember, these aren't tablets; these are

2 capsules.

3          MR. WAIDE:  All right.  Doctor, I believe that

4 is all that I have.  Counsel will ask some questions for

5 you.  I don't know whether they want to take a break.

6          MR. O'CONNELL:  Not right now.  Not right now.

7          MR. WAIDE:  Is it okay with you?  You all need a

8 break out there?

9          THE WITNESS:  No.  I'm fine, Counselor.  Okay.

10

11                          EXAMINATION

12 BY MR. O'CONNELL:

13     Q.  Dr. Michlin, you are not a lawyer; is that

14 correct?

15     A.  That is correct.

16     Q.  Okay.  And except for your experience testifying

17 in various cases as an expert witness, you have not

18 received, you know, any formal legal training; is that

19 also correct?

20     A.  I am not a lawyer; that is correct.

21     Q.  Okay.  And is it also direct that you have never

22 received any formal legal training in, you know, areas of

23 the law?

24     A.  I have taken medical/legal courses as they

25 pertain to medicine for CME at appropriate conferences,

                                                         83

SAN DIEGO COURT REPORTING SERVICE

1 but not as a lawyer, but as a doctor.

2    Q.   Okay.  And so to the extent that would be

3 considered, you know, formal medical/legal training, that

4 is the extent of the formal legal training that you have

5 received?

6    A.   Correct.

7    Q.   So you have never studied or learned how to

8 evaluate how terms are defined and applied under 42 USC

9 Section 1983, have you?

10   A.   Are we referring to a reasonable degree of

11 medical probability versus a reasonable --

12   Q.   If you'd like me to, let me rephrase the

13 question and go at it again.

14        Are you familiar, as you sit here today, can you

15 tell me what the statute in the US Code -- 42 USC Section

16 1983 is or what it covers?

17   A.   No.

18        MR. WAIDE:   Object that that is a legal

19 question.  That's not a question of a doctor.

20        MR. O'CONNELL:   Well, okay.

21   Q.   Have you ever undergone, you know, any training

22 or instruction as to, you know, how to evaluate and apply

23 the meaning of key legal terms and phrases that come up

24 in Section 1983 cases?

25   A.   Are we referring to the terms possibility,

                                                        84

1 probability?

2     Q.  No, sir.

3     A.  Okay.  I can only speak to -- I understand when

4 I say to a reasonable degree of medical probability,

5 certainty or possibility.  Those are the terms that I can

6 relate to.

7     Q.  Okay.  So you have not undergone any formal

8 legal training that applies to how to interpret and

9 utilize various phrases that exist in legal cases under

10 Section 1983?

11        MR. WAIDE:  Excuse me.  Object as to the form of

12 the question.  He's not a lawyer.  That's not an

13 appropriate question.

14        THE WITNESS:  Again, I can only tell you that I

15 practice medicine and I give my opinions as a physician.

16 I'm not a lawyer, and I don't give any legal -- legal

17 opinions.

18 BY MR. O'CONNELL:

19     Q.  Okay.  And, you know, have you ever read or

20 studied what the phrase "deliberate indifference" means

21 as interpreted and applied by federal courts in the

22 United States?

23     A.  I have used those terms in the past.  I have

24 been -- in different cases those terms have been

25 discussed.  And I find to come to that level and to say

85

1 to deliberate is -- has a very high bar to pass.

2     Q.   Okay.  But -- you know, but have you ever

3 studied the case law yourself that defines what that term

4 means and how it is to be applied?

5     A.   No.   How I apply it is from a point of view of a

6 physician.

7     Q.   So insofar as lawyers and judges are concerned,

8 you do not know how they interpret and apply the phrase

9 "deliberate indifference"; you only know how to

10 interpret -- or what that phrase means to you as a

11 physician?

12     A.   I don't know how to answer that question,

13 Counselor.

14     Q.   Okay.  Let me go back just a moment.  You said

15 that, you know, you use the phrase as a medical doctor

16 or, you know, it's meaning to you comes from your

17 experience as a medical doctor; is that right?

18     A.   And the interpretation of the English language.

19     Q.   Okay.  But it's not from an interpretation of

20 the law applied by judges in courts, is it?

21     A.   I don't know that.  I don't know -- if I'm asked

22 a question and I answer it and a judge asks me the

23 question and I give him an answer, I can only assume that

24 the fact that I'm being asked that question would

25 indicate that they are going to respect my answer or at

86

1  least feel that I'm able to give that answer.  So I know

2  what the "deliberate" means.  I know what "intent" means.

3  I know what the words mean.  I know what they mean in

4  English.  I know what we are trying to get past.  We are

5  trying to get past -- there is a difference between

6  someone doing something wrong that then leads to injury

7  or death and to damages or causation.  I understand that

8  there are people that do things wrong and that what they

9  do was stupid, unintentional but stupid.  And then you

10  have people are who are -- just don't care.  It's a

11  complete indifference to what -- I'm not going to do that

12  and I don't care what happens.  If you dye, you dye; I

13  don't remember care; I'm not interested in what happens.

14  That is what I mean when you use the word "indifference."

15  Okay.

16          It's like I'm going to scream fire in a theater

17  and I don't care who gets trampled, who gets hurt.  That

18  is an indifference to what -- to what their actions

19  occurred.

20      Q.  All right.  But in terms of actually evaluating

21  and studying the means of that term in legal cases and

22  the way it's used in the courts, you haven't done that,

23  have you?

24      A.  I am not an attorney; I don't pretend to be an

25  attorney, and I don't mean to be misinterpreted as an

87

1 attorney.

2    Q.   All right.   Have you ever read the deposition

3 transcript of Dr. Steven Hayne?

4    A.   Only a summary, not the actual deposition.

5    Q.   Do you have that summary with you?

6    A.   I don't see it in front of me, Counselor?   Wait

7 a minute.   I got a couple more.

8         No, I don't see it.

9    Q.   Okay.   But you had it somewhere in your

10 possession?

11    A.   If I don't have it in front of me here, then

12 when I said that I reviewed it, I misspoke.   Because to

13 the best of my knowledge, everything I have reviewed is

14 here.   So I don't see it here, so I either misplaced it

15 or I misspoke when I told you that I reviewed it.

16    Q.   Let me ask you this.   As you sit here and

17 testify today, do you know whether it's one or the other,

18 whether you did not review or whether you did review it

19 and misplaced it?

20    A.   As I sit here at this moment and I'm looking at

21 what I have, I believe I have not reviewed his deposition

22 of his deposition summary.   What I was mistaken for

23 reviewing was the death certificate and his actual

24 autopsy report.

25    Q.   Okay.   So you can not tell us here today, Dr.