# EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF MISSISSIPPI

DELTA DIVISION

| | |
|---|---|
| SHIRLEY WHITE, As Wrongful Death Beneficiary or KEITH PERKINS, DECEASED, | * * * * |
| Plaintiff, | * * |
| vs. | * Cause No. 2:09CV161-D-V * Consolidated |
| WEXFORD HEALTH SOURCES, INC., | * * |
| Defendants. | * * |

CONSOLIDATED WITH

| | |
|---|---|
| SHIRLEY WHITE, As Wrongful Death Beneficiary or KEITH PERKINS, DECEASED, | * * * * |
| Plaintiff, | * * |
| vs. | * Cause No. 2:09CV161-D-V * |
| CHRISTOPHER EPPS, Individually and in his Official Capacity, et al., | * * * * |
| Defendants. | * * |

VIDEOTAPED VIDEO CONFERENCE DEPOSITION OF
BERNARD MICHLIN, M.D.

Taken at San Diego, California
March 7, 2013


T. A. Martin, CSR
Certificate No. 3613

```
 1                         I-N-D-E-X

 2  DEPOSITION OF BERNARD MICHLIN, M.D.              PAGE
         March 7, 2013
 3
            Examination by Mr. Waide
 4
            Examination by O'Connell
 5

 6  EXHIBITS:                                        PAGE

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                                                        2
```

```
 1            DEPOSITION OF BERNARD MICHLIN, M.D.
 2            Pursuant to Notice to Take Deposition, and on
 3  the 7th day of March, 2013, commencing at the hour of
 4  9:15 o'clock p.m., at 401 West A Street, Suite 135, in
 5  the City and County of San Diego, State of California,
 6  before me, T. A. Martin, Certified Shorthand Reporter in
 7  and for the State of California, personally appeared:
 8                  BERNARD MICHLIN, M.D.,
 9  who, called as a witness, and being by me first duly
10  sworn, was thereupon examined as a witness in said cause.
11                        APPEARANCES
12  For the Plaintiff:
13                  WAIDE & ASSOCIATES, PA
                    By:  JIM WAIDE, ESQ.
14                  Post Office Box 1357
                    Tupelo, Mississippi  38802
15                  662-842-7324
16
    For Defendant Wexford Health Sources, Inc.:
17
                    JOSEPH A. O'CONNELL, ESQ.
18                  Post Office Box 18109
                    Hattiesburg, Mississippi 39404
19
20  For Defendants MDOC, Christopher Epps and Gloria Perry:
21                  SPECIAL ASSISTANT ATTORNEY GENERAL
                    TOMMY GOODWIN, ESQ.
22                  Post Office Box 220
                    Jackson, Mississippi   39205
23
24  VIDEOGRAPHER:   Shayne Davidson, VideoTrack
25
```

SAN DIEGO COURT REPORTING SERVICE

1 faxing the whole thing would be.

2          MS. MONTEITH:  Joe, how many pages do you have
3 here?

4          MR. O'CONNELL:  All I have from the Tunica
5 records, Mary, are what was produced as those depositions
6 at Andy Delayne's office in Tunica and, you know, maybe
7 in copying them they left out a page for you, but that is
8 what I have.

9          MS. MONTEITH:  We are just missing the one page.

10         MR. WAIDE:  All right.  Tell you what.  Let's
11 make a copy.  Mine is only four; yours is only five.
12 Let's send a copy of your five pages to him and let
13 us get a copy.

14         MR. O'CONNELL:  Well, I've got -- let me just
15 get all the pages.

16         VIDEOGRAPHER:  Can I give you a fax number?

17         MR. O'CONNELL:  You may.

18         VIDEOGRAPHER:  Area code 619, 234-1890.

19         MR. O'CONNELL:  Why don't we take a break while
20 we get this faxed.  I think that would be the sensible
21 thing to do at this point.

22         MR. WAIDE:  Give us about five minutes, Doctor.

23         THE WITNESS:  That is fine.  Thank you.

24         VIDEOGRAPHER:  Off the record at 12:07 p.m.

25         (Recess taken.)

```
 1          VIDEOGRAPHER:  We are back on the record at
 2 12:20 p.m.
 3 BY MR. O'CONNELL:
 4     Q.   Dr. Michlin, let me, if I can, direct your
 5 attention to the second page of the nurses notes and to
 6 an entry that was made at 7:00 a.m. on May 20, 2008.  Do
 7 you see that?
 8     A.   Yes.  On 5/20/08?
 9     Q.   Yes.  5/20/08 at 7:00 a.m.
10     A.   Yes.
11     Q.   Have you had a chance to read that?
12     A.   Give me a moment, please.
13          Yes.
14     Q.   Okay.  Now, the first part of that note
15 indicates, does it not, that the previous evening at
16 approximately 9:00 p.m. Nurse Janice Pugh got a call from
17 Sergeant Harris who was reporting to her that Mr. Perkins
18 had a small seizure and no apparent injuries, correct?
19     A.   Yes, I see that, Counselor.
20     Q.   Okay.  And how did Nurse Pugh respond to
21 Sergeant Harris?  What did she tell him?
22     A.   Something to let inmate go on to bed, re --
23 something officer inmate routinely -- routinely having
24 seizures.
25     Q.   Okay.  And would the first word in that last
```

96

1 phrase be "reminded officer inmate routinely having
2 seizures"?
3    A.  That is consistent. Then there is another
4 line -- it looks like a dash, two weeks ago or so before
5 coming to jail.
6    Q.  Right. Okay. And if you look up above that at
7 the entry for April 22, 2008, does that also appear to be
8 an entry made by Nurse Janice Pugh?
9    A.  Are you talking about where it says "readmitted
10 this date on stated charges"?
11    Q.  Yes, I am. That is it.
12    A.  Okay.
13    Q.  That is the entry.
14    And in that particular entry, you know, what did
15 Ms. Pugh learn from Mr. Perkins about when he had had his
16 last seizure?
17    A.  Await sentencing, brought to jail as follows.
18 Lamictal, Tegretol, Keppra. Verbal orders to continue
19 all three meds. Last seizure was three last week.
20 Having seizures routinely Q two weeks or so.
21    Q.  Okay. And what does Q two weeks or so mean?
22    A.  Once every two weeks.
23    Q.  Now, are there different external conditions
24 that can, you know, trigger or lead to seizures in a
25 seizure patient?

1  and 0835 -- those two military times or designations --
2  are probably entered incorrectly as to the time and
3  relate to episodes that occurred not in the a.m., but in
4  the p.m.?
5       A.  I will accept that -- yeah.  I mean I didn't see
6  that on my own, but when they said it was a mistake, I
7  accept that.
8       Q.  Okay.  Now, Mr. Perkins, you know -- at least
9  according to the note that is before you, the one made by
10 Ms. Russell on the 14th, that indicates, does it not,
11 that Officer Skipper reported to Nurse Russell that the
12 seizure activity experienced by Mr. Perkins had occurred
13 in the p.m.
14      A.  Correct.
15      Q.  Had occurred -- in other words, not a.m., early
16 in the morning on the 14th, but sometime in the evening
17 on June 13th?
18      A.  I would accept that.  That doesn't -- that is
19 fine.
20      Q.  Okay.  And if you accept that as accurate, then
21 it would follow that, you know, there is no report or
22 documentation of Mr. Perkins experiencing a seizure any
23 time on Saturday, June 14th, correct?
24      A.  You mean if we move the 3:25 report to 6/13,
25 then there is no -- there is no report of seizure --

1 there is no report of the seizure occurring on the 14th,
2 and the next seizure would have occurred at 11:00 o'clock
3 on the 15th in the evening, yes.
4    Q.  Yes.
5    A.  Yes. That is fine.
6    Q.  Okay. And, again, when we get to the 15th, we
7 go, you know, 23 hours of the 15th before there is
8 another report of a seizure, correct?
9    A.  No. Actually I'd give you more than that,
10 right? It's almost --
11    Q.  Let me ask --
12    A.  It's almost 48 hours. If you're going to say
13 that it was late on the 13th and this was late on the
14 15th, Counselor, I'll give you 48 hours.
15    Q.  Okay.
16    A.  Yes.
17    Q.  Thank you.
18        Now, he did return to the clinic early in the
19 morning on Monday, June 16th, 2008, correct?
20    A.  Yes.
21    Q.  Okay. And at that time he was there for a
22 period of two hours before he was observed having another
23 seizure at 4:00 a.m., correct?
24    A.  Correct.
25    Q.  Okay. And after he had experienced that seizure

104